In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23–2728

UNITED STATES OF AMERICA, ex rel.,
JUDITH ROBINSON,

*Plaintiff,*

and

STATE OF INDIANA,

*Plaintiff-Appellee*

*v.*

HEALTHNET INC.,

*Defendant-Appellee.*

APPEAL OF: JUDITH ROBINSON

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-4258-JRS-TAB — **James R. Sweeney II**, *Judge.*

_____

ARGUED MARCH 29, 2024 — DECIDED DECEMBER 26, 2024

_____

Before ROVNER, ST. EVE, and PRYOR, *Circuit Judges.*

ROVNER, *Circuit Judge*. On its face, this is a *qui tam* action brought by Dr. Judith Robinson, the relator, on behalf of the United States and the State of Indiana, against HealthNet, a federally qualified health center in Indiana which provides, among other services, obstetric and gynecologic services to individuals at or below the federal poverty level. Because we find that the relator lacks standing to bring Count III of her amended complaint and the settlement between Indiana and HealthNet is fair, adequate, and reasonable, we affirm the holdings of the district court.

**I.**

HealthNet employed Dr. Robinson from 2005 until 2013. During her time at HealthNet, Dr. Robinson witnessed certain practices that caused her concern, including discrepancies between the way certain patient services were performed and how those services were billed and recorded. For example, Medicaid will only reimburse ultrasound readings if those readings are done during a face-to-face encounter between the doctor and the patient. In her wrap-around claims—called "wrap-around" due to the reimbursement calculation and structure for the underlying service—Dr. Robinson alleged that HealthNet doctors would review ultrasound photographs at the end of the day, rather than during a face-to-face encounter, but would bill Medicaid as though the doctor had read the ultrasound during a face-to-face encounter. As a result of her concerns, Dr. Robinson brought a *qui tam* suit, *United States & Indiana ex rel. Robinson v. Indiana University Health, Inc., et al.*, No. 1:13-cv-2009-TWP-MJD (S.D. Ind. 2013) ("*Robinson I*"), on behalf of the United States and the State of Indiana alleging violations of the federal Anti-Kickback

Statute and False Claims Act and the Indiana False Claims and Whistleblower Protection Act.

When an individual brings a *qui tam* suit, he or she is termed the "relator." The relator stands in the shoes of the government, and he or she prosecutes the action on the government's behalf. The government is permitted to intervene in the action, but it is not required to do so, and the relator may continue the action even if the government does not intervene. However, if the government does intervene, it takes primary responsibility for prosecuting the action. If the action successfully results in a recovery for the government, the relator is entitled to a share of that recovery. The size of the share varies from suit to suit, and it depends on the specific characteristics of the action, including whether the government intervened.

In April 2017, Dr. Robinson reached a settlement with HealthNet in *Robinson I*. At the time of settlement, the value of the wrap-around claims could not be determined because Indiana had not completed its reconciliation process. As a result, the settlement agreement specifically excluded the wrap-around claims and dismissed the remaining claims with prejudice. The wrap-around claims, by contrast, were dismissed without prejudice. The settlement awarded Dr. Robinson a relator's share of 27.5% of the $18 million recovered by the United States and Indiana.

By March 2018, the reconciliation process concluded, and the value of the wrap-around claims was determined to be $1,454,541.91. A dispute arose between Indiana and the United States about each entity's liability for the relator's share. The federal government reimburses states that participate in Medicaid for a portion of their Medicaid expenditures.

The reimbursement amount is based on the Federal Medical Assistance Percentage ("FMAP"), which is tied to each state's per capita income. For the period of the wrap-around claims, Indiana's FMAP was approximately 66%. Thus, in Indiana's view, it only had liability to Dr. Robinson for a relator's share based on 33% of the recovery because the federal government had reimbursement responsibility for 66% of the total recovery. In the United States's view, Indiana had never submitted these wrap-around claims to it for reimbursement and, therefore, it had not suffered a loss. HealthNet, for its part, had refused to accept funds from Indiana for the wrap-around claims.

In June 2019, Dr. Robinson moved to reopen *Robinson I*. In her motion, Dr. Robinson claimed that she reached an oral settlement agreement with HealthNet as to the wrap-around claims and, now that those claims could be valued, she wished to enforce the oral settlement agreement. Magistrate Judge Dinsmore, to whom the district court judge referred the motion to reopen, held a status conference and denied the motion to reopen in a minute entry. In that entry, Judge Dinsmore wrote that the court no longer had subject matter jurisdiction over the wrap-around claims because they had been dismissed, but that Dr. Robinson could file another suit for the purposes of resolving whether the United States or the State of Indiana should pay Dr. Robinson's share.

Instead of following Judge Dinsmore's suggested course of action, Dr. Robinson then filed this suit, *Robinson II*, which was assigned to Judge Sweeney, against one defendant, HealthNet. In her complaint, Dr. Robinson realleged the substantive allegations related to the wrap-around claims from her complaint in *Robinson I*, as well as other claims that she

had also raised and settled in *Robinson I*. *See e.g.*, R. 9 at 11 (alleging that HealthNet submitted claims for the administration of Depo-Provera birth control as a physician-patient encounter when, in reality, the Depo-Provera shot was administered by a nurse). Count I of *Robinson II* alleged violations of the federal False Claims Act and Count II alleged violations of the Indiana False Claims Act. Dr. Robinson also included Count III, which was new to the *Robinson II* complaint. Count III sought to enforce the alleged oral settlement agreement reached between Dr. Robinson and HealthNet and requested that the court "use its equitable powers" to enforce the alleged oral agreement. R. 9 at 18. Notably, Dr. Robinson does not allege that either the State of Indiana or the United States has failed to abide by the oral settlement agreement.

The United States declined to intervene in *Robinson II*, but Indiana exercised its right to intervene and made a series of motions that changed the scope of the litigation. Specifically, Indiana sought to dismiss all claims except for the wrap-around claims as barred under res judicata. As to the wrap-around claims, Indiana argued that both the federal and Indiana False Claims Act statutes have a six-year statute of limitations that is triggered when the violation occurs, and a second three-year statute of limitations that is triggered when the government learns of the false claim. R. 20 at 16–17. Dr. Robinson filed *Robinson II* on October 17, 2019; thus any violations that occurred before October 17, 2013 were barred unless the federal government and Indiana learned of the alleged violations within the three years prior to the filing of *Robinson II*. *Id.* However, Dr. Robinson filed *Robinson I* on October 29, 2014, which alerted the government entities to the alleged violations. *Id.* Thus, any wrap-around claims that occurred before October 17, 2013 were time-barred. *Id.* Dr. Robinson did

not oppose Indiana's motion, and the district court dismissed all claims except for the wrap-around claims that allegedly arose between October 18, 2013 and February 28, 2015. R. 38.

Indiana also argued that the court lacked subject matter jurisdiction over Count III of Dr. Robinson's complaint both facially and factually. R. 43. The district court agreed with Indiana that, based on the evidence presented to it by the parties, Dr. Robinson lacked standing and, in turn, it lacked subject matter jurisdiction factually. R. 80. The district court declined to address Indiana's facial challenge because its determination as to the factual challenge was "sufficient to decide [Indiana's] motion." *Id.* at 9. In explaining its holding, the district court started from the premise that a relator—like Dr. Robinson—does not suffer an injury in fact until "the *qui tam* action is completed and recovery is made." *Id.* at 8–9. Then, the district court explained, Dr. Robinson would only have an injury in fact—a required element of standing—if a settlement agreement existed. *See id.* at 10. But Indiana proffered evidence that called Dr. Robinson's standing into question. *Id.* at 11–12. This evidence included the *Robinson II* complaint, which stated that all claims *except* the wrap-around claims were settled on May 4, 2017, the *Robinson I* settlement agreement, which contained an integration clause that claimed that the written settlement agreement (which specifically excluded the wrap-around claims and made no mention of an oral agreement) was the "complete agreement between the parties," and the relator's motion to reopen, which was filed three years after *Robinson I* was settled, and stated that the parties "were finally prepared to *reach* a settlement agreement" and made no mention of the alleged oral agreement. *Id.* at 11–13 (emphasis added). This proffer, which removed the "presumption of correctness" that normally accords to a

complaint's allegations, shifted the burden back to Dr. Robinson to prove the existence of an oral settlement agreement. *Id.* at 12. In response, Dr. Robinson argued that Indiana's evidence did not exclude the possibility that an oral agreement existed, and that Judge Dinsmore's entry stating that the *Robinson I* court lacked jurisdiction over Dr. Robinson's motion to reopen memorialized the agreement. *Id.* But this, the district court explained, did not constitute competent proof. *Id.* at 13. Indeed, the only affirmative proof that Dr. Robinson offered the district court, Judge Dinsmore's entry, "in no way support[ed]" Dr. Robinson's claim that an oral agreement existed. *Id.* As a result, the court dismissed Count III without prejudice, leaving only the wrap-around claims, alleged under federal and state law, pending. *Id.* at 15.[1]

Indiana also filed its own complaint in intervention, which further changed the scope of the litigation. R. 17. Dr. Robinson had filed her *Robinson II* complaint under the federal False Claims Act and the Indiana False Claims Act statute. R. 9. Indiana's complaint-in-intervention realleged the Indiana False

---

[1] In the same order, the district court addressed HealthNet's motion to dismiss Dr. Robinson's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dr. Robinson claims that the district court erred in its order by dismissing her Count III on the merits after the district court determined that it lacked jurisdiction. But careful reading of the order indicates that Count III was dismissed because the court lacked subject matter jurisdiction. Indeed, the court wrote "HealthNet's motion is denied as moot as to Count II and granted as to Count III of the Amended Complaint *for lack of subject matter jurisdiction as address[ed] in granting Indiana's motion*." R. 80 at 18 (emphasis added). Dr. Robinson's argument that the district court improperly dismissed Count III without leave to amend faces a similar obstacle. The district court's order states, "Count III of the Relator's Amended Complaint is dismissed without prejudice for lack of subject-matter jurisdiction." *Id.* at 19.

Claims Act claim, but also alleged a claim under the Indiana Medicaid False Claims Act. R. 17 at 25–28. Indiana's complaint-in-intervention superseded Dr. Robinson's allegations in Count II. R. 80. Following these changes, the remaining claims were the wrap-around claims from October 18, 2013 to February 28, 2015, as pled under the Federal False Claims Act, in Count I, and under the Indiana False Claims Act and the Indiana Medicaid False Claims Act, in Count II.

Indiana then moved to settle the remaining state-law claims with HealthNet, and Dr. Robinson dismissed Count I of her complaint, which left only the state wrap-around claims pending. The settlement valued these claims at $155,413.58. R. 97 at 2. It arrived at such a calculation by reducing the calculated value of the wrap-around claims ($1,454,541.91) by the value of the claims dismissed as time-barred ($984,730.69). R. 84 at 10–11. The settlement agreement further reduced the value of the settlement by 66.92%, which represented the FMAP. *Id.*

Dr. Robinson opposed the settlement as unfair because it reduced her relator's share. She argued that she had orally settled the claims between January 1, 2011 and February 28, 2015 with HealthNet and, therefore, she was entitled to a relator's share that reflected the value of all the wrap-around claims, including the claims dismissed as time-barred. She also argued that the value of the settlement should not be reduced by the federal share because Indiana had not submitted the wrap-around claims to the federal government for reimbursement and thus, in Dr. Robinson's view, Indiana received the entire value of the settlement agreement.

The district court rejected Dr. Robinson's arguments and found that the settlement was fair, adequate, and reasonable

under the unique circumstances of the action. R. 80 at 13. The district court explained that it was Dr. Robinson's choice of actions—not the settlement—that reduced the relator's share. *Id.* at 9–11. Specifically, Dr. Robinson failed to obtain a tolling agreement with HealthNet as to the wrap-around claims and, therefore, many of those claims were time-barred. *Id.* Furthermore, the district court judge found that the FMAP percentage should be applied, thus reducing the value to Indiana by approximately 66%. *Id.* at 11–13.

On appeal, Dr. Robinson challenges the district court's holdings that it lacked jurisdiction over Count III and that the settlement was fair, adequate, and reasonable.

## II.

We begin by considering Dr. Robinson's standing and, in turn, our subject-matter jurisdiction over Count III. The Constitution limits federal courts' jurisdiction to "cases" and "controversies," U.S. Const. art. III § 2, cl. 1, and "standing is an essential ingredient of subject-matter jurisdiction." *Bazile v. Fin. Sys. of Green Bay, Inc.,* 983 F.3d 274, 278 (7th Cir. 2020). As the party invoking the court's jurisdiction, Dr. Robinson bears the burden of demonstrating that she has standing. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992); *Silha v. ACT, Inc.,* 807 F.3d 169, 173 (7th Cir. 2015). To carry her burden, Dr. Robinson "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016). This injury "must actually exist." *Id.* at 340. Until the underlying "litigation is complete[] and the relator prevails," Dr. Robinson, as the relator, only has standing insofar as the government would have standing. *Vt. Agency of Nat. Res. v. United States ex*

*rel. Stevens*, 529 U.S. 765, 772–74 (2000). In other words, it is the government's injury that gives Dr. Robinson standing, not an injury to the relator herself. *Id.* at 774.

Standing must exist throughout the litigation, and if standing is challenged by the court or a party, then the party invoking the court's jurisdiction must present "competent proof" that standing exists. *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–45. (7th Cir. 2009). Standing may be challenged either facially or factually. A facial challenge to standing "argues that the plaintiff has not sufficiently '*alleged* a basis of subject matter jurisdiction'" whereas a factual challenge to subject-matter jurisdiction "contends that 'there is *in fact* no subject matter jurisdiction,' even if the pleadings are formally sufficient." *Silha*, 807 F.3d at 173 (emphasis in original) (quoting *Apex Digit.*, 572 F.3d at 443–44). Here, the district court found that Dr. Robinson factually lacked subject-matter jurisdiction because, after Indiana proffered evidence that no oral settlement agreement existed, Dr. Robinson failed to present competent evidence that an oral settlement agreement existed between herself and HealthNet. Our review of the district court's determination is *de novo*. *Bazile*, 983 F.3d at 278.

We find that Dr. Robinson failed to establish standing, but for reasons slightly different from those articulated by the district court. Dr. Robinson insists that she brings Count III on behalf of the government, Robinson Br. at 17, but she fails to allege any injury related to the settlement agreement that the government has suffered at the hands of HealthNet. According to Dr. Robinson, the terms of the agreement were that HealthNet would not accept reimbursement for the allegedly

fraudulent claims and, in return, Dr. Robinson would dismiss the suit. R. 9 at 14, ¶ 38; Robinson Br. at 38–40. HealthNet claims that it has not accepted any of the alleged overpayment, and Dr. Robinson does not dispute that representation. HealthNet Br. 11. Thus, accepting, *arguendo*, that an oral agreement did exist, Dr. Robinson has not articulated how HealthNet has breached that agreement or what injury the government has suffered.

That is not to say that a relator is without recourse if he or she settles a *qui tam* suit only to have the government intervene and execute a less-favorable settlement with the purpose of reducing the relator's share. Because the interests of the government and the relator diverge at settlement, such an allegation is concerning and worthy of close consideration by the court. *See United States v. United States ex rel. Thornton*, 207 F.3d 769, 773 (5th Cir. 2000) (noting that the interests of the government and relator "diverge when it comes time to pay the relator's share"). But such an argument is better considered as a challenge to the fairness of the government's settlement rather than an independent claim alleging breach of contract against the defendant particularly where, as here, the plaintiff cannot demonstrate that the defendant breached. Indeed, *qui tam* defendants, including HealthNet, do not unilaterally determine the relator's share. 31 U.S.C. § 3730(d); Ind. Code § 5-11-5.7-6(a)(4) ("After conducting a hearing at which the attorney general or the inspector general and the person who initially filed the complaint may be heard, the court shall determine the specific amount to be awarded under this section to the person who initially filed the complaint."); Ind. Code § 5-11-5.5-6(a)(4) (same). And, as Dr. Robinson has claimed, it was the government entities that allegedly

promised Dr. Robinson a particular relator's share, not
HealthNet. R. 57 at 11 n. 7.

Because Dr. Robinson has failed to allege any breach of the
alleged oral settlement agreement by HealthNet, she lacks
standing to bring Count III. We, therefore, affirm the district
court's dismissal of Count III for lack of subject-matter juris-
diction. With our jurisdiction clarified, we turn to the fairness,
adequacy, and reasonability of the Indiana and HealthNet's
settlement of Count II.

### III.

As we alluded to above, Dr. Robinson's suit is more
properly understood as a challenge to the fairness of the set-
tlement agreement between HealthNet and Indiana. The gov-
ernment may settle a *qui tam* action over the objection of the
relator if the court finds "after a hearing, that the proposed
settlement is fair, adequate, and reasonable under all the cir-
cumstances." 31 U.S.C. § 3730(c)(2)(B); Ind. Code § 5-11-5.5-
5(c) (same under the Indiana False Claims and Whistleblower
Protection Act); Ind. Code § 5-11-5.7-5(c) (same under the In-
diana Medicaid False Claims and Whistle Blower Protection
Act). All parties cite *United States v. Everglades Coll., Inc.*, 855
F.3d 1279, 1289 (11th Cir. 2017), for the inquiry the court must
make when reviewing a *qui tam* settlement. In that case, the
Eleventh Circuit stated that

> [R]eview of proposed settlements must account for the
> reasonableness of the rationale offered by the govern-
> ment as well as the potentially prejudicial effect on the
> relator. Thus, we ask whether the government has ad-
> vanced a reasonable basis for concluding the settle-
> ment is in the best interests of the United States, and

whether the settlement unfairly reduces the relator's potential *qui tam* recovery.

*Everglades Coll.*, 855 F.3d at 1289, *abrogated on other grounds by United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419 (2023).[2]

Of course, the district court reviews the settlement agreement first, and our review is of the district court's decision. The district court's decision is discretionary, and our review is for an abuse of that discretion. *See United States ex rel Grear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 730 (7th Cir. 2006) (reviewing the award of costs in a *qui tam* suit for abuse of discretion), *abrogated on other grounds by Canter v. AT&T Umbrella Benefit Plan No. 3*, 33 F.4th 949 (7th Cir. 2022). Indeed, the statute directs that a district court must assure itself that the settlement is fair, adequate, and reasonable, which mirrors the directive in Rule 23 to courts considering class action settlements. Fed. R. Civ. P. 23(e) (instructing that the court must find "a proposed settlement, voluntary dismissal, or compromise" that would bind class members "fair, reasonable, and adequate"). We review class action settlements for abuse of discretion and, even though differences exist

---

[2] The Eleventh Circuit's decision in *Everglades College* considered the federal False Claims Act, but did not have reason to consider the Indiana False Claims and Whistleblower Protection Act or the Indiana Medicaid False Claims and Whistleblower Protection Act, the statutes under which the state wrap-around claims were alleged following Indiana's complaint in intervention. R. 80. However, the relevant provisions in the Indiana statutes are materially indistinguishable from the federal statute, and we have no reason to believe—nor has any party argued—that the settlements of claims brought under the Indiana statutes should be reviewed differently from settlements achieved under the federal statute. *See Ind. C.R. Comm'n v. Sutherland Lumber*, 394 N.E.2d 949, 954 (Ind. Ct. App. 1979).

between *qui tam* suits and class actions, we see no reason to apply a different standard of appellate review to the approval of settlements of these suits, nor has any party advocated for a different standard. *See e.g.*, *In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 711 (7th Cir. 2015).

In Dr. Robinson's view, she orally settled all the wrap-around claims at some point before she filed *Robinson II* and, therefore, the pending settlement agreement is unfair because it grants her a relator's share based only on the wrap-around claims occurring between October 18, 2013 and February 28, 2015, thus reducing her recovery. Dr. Robinson further argues that the settlement is unfair because the amount attributable to Indiana's recovery is reduced by the amount Indiana could have recovered from the federal government, had Indiana reimbursed HealthNet's claims. In Dr. Robinson's view, Indiana has received the entire benefit of the claims because the United States—which now doubts the claims' legitimacy—will not reimburse Indiana for those claims should Indiana pay them to HealthNet.

We begin by examining why the basis for the relator's share resulting from Indiana and HealthNet's settlement is smaller than the basis stemming from the alleged oral agreement. Of course, the basis for the relator's share relies wholly on the amount recovered by the government entity as a result of the *qui tam* action. 31 U.S.C. § 3730(d); Ind. Code § 5-11-5.7-6; Ind. Code § 5-11-5.5-6. Indeed, under each statute, the relator receives a percentage of the recovery obtained by the government. *Id.*

In *Robinson I*, Dr. Robinson alleged that HealthNet submitted fraudulent wrap-around claims from January 1, 2011 until February 28, 2015. We now know the value of those claims to

be approximately $1.4 million. So, the maximum relator's share was some percentage of $1.4 million. Dr. Robinson claims that she orally settled the wrap-around claims with HealthNet at some point before she filed *Robinson II* and that the oral settlement agreement guaranteed her a percentage of the $1.4 million. That, Dr. Robinson argues, is the end of the story.

But as the district court considered, and as we must too, that is only the end of the chapter, not the story. At the end of *Robinson I*, Dr. Robinson dismissed the wrap-around claims without prejudice. Even though Dr. Robinson was free to re-file the wrap-around claims after the dismissal, *Robinson I* put the government on notice about the wrap-around claims and, thus, the statute of limitations continued to tick by. 31 U.S.C. § 3731(b) (suit must be brought within "3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances"); Ind. Code § 5-11-5.5-9(b) (same under Indiana False Claims Act); Ind. Code § 5-11-5.7-9(b) (same under Indiana Medicaid False Claims Act); *Beck v. Caterpillar Inc.*, 50 F.3d 405, 407 (7th Cir. 1995) (the statute of limitations continues to run during the pendency of a timely filed case, and a voluntarily dismissed suit "is treated as if it had never been filed"). Notably, Indiana did not intervene in *Robinson I*, thus Dr. Robinson retained "primary responsibility for prosecuting the action." *See* 31 U.S.C. § 3730(c); Ind. Code § 5-11-5.5-5(e) (under the Indiana False Claims Act, "[i]f the attorney general or the inspector general elects not to intervene in the action, the person who initially filed the complaint has the right to prosecute the action"); Ind. Code § 5-11-5.7-5(e) (same under Indiana Medicaid False Claims Act).

Between *Robinson I* and *Robinson II*, the parties sought to draft a written agreement settling the wrap-around claims. Indiana started from the proposition that the recovery was valued at $1.4 million and that the relator's share would be a percentage of that amount. R. 62-3 at 32. But a dispute arose when the United States claimed that it suffered no loss (because Indiana had not submitted the wrap-around claims to it for reimbursement) and thus it would not pay any portion of the relator's share. *Id.* Indiana, for its part, only believed that it was the ultimate beneficiary of 33% of the $1.4 million because, had Indiana paid HealthNet's wrap-around claims, Indiana would have sought reimbursement from the federal government for approximately 66% of the $1.4 million. Thus, Indiana agreed to pay approximately 33% of the relator's share. *Id.* The relator was unhappy with Indiana's offer and wanted Indiana to pay the entire relator's share. *Id.* at 49. Indiana refused and *Robinson II* ensued.

By the time Dr. Robinson brought *Robinson II*, many of the wrap-around claims were untimely. When Indiana, which assumed primary responsibility for prosecuting *Robinson II*, moved to dismiss the untimely wrap-around claims as time-barred, Dr. Robinson did not object. The dismissal of the wrap-around claims dramatically reduced the amount of money that Indiana could recover from HealthNet through *Robinson II* and, in turn, the basis for the relator's share. The dismissed claims are valued at $984,730.69, leaving the remaining claims valued at $155,413.58. Now, Indiana seeks to settle the remaining claims.

Considering this development of events, the district court's conclusion that the settlement agreement is "fair, adequate, and reasonable under all the circumstances" was not

an abuse of discretion. 31 U.S.C. § 3730(c)(2)(B); Ind. Code § 5-11-5.5-5(c); Ind. Code § 5-11-5.7-5(c). It was Dr. Robinson's choice to dismiss the wrap-around claims while the reconciliation was ongoing and her failure to obtain a tolling agreement that limited the scope of cognizable claims, not the settlement agreement, or some unfairness perpetrated by Indiana or HealthNet. Indeed, Indiana did not intervene in *Robinson I*, so these choices rested with Dr. Robinson alone.

Dr. Robinson relies heavily on a Fifth Circuit case, *United States v. United States ex rel. Thornton*, 207 F.3d 769 (5th Cir. 2000), for the proposition that the other, time-barred wrap-around claims should be included in calculating the value of the settlement and, in turn, her relator's share. But *Thornton* itself instructs that "for the value of the released claims to be included, there must be an indication that they were released *in return for the government's release of the [False Claims Act] claims*." *Thornton*, 207 F.3d at 771 (emphasis added). Because relator's inaction made the wrap-around claims non-cognizable, there are no claims for the government to release in exchange for the time-barred wrap-around claims. In this context, where actions by the relator, not the government, limited the scope of cognizable claims, and the government has offered reasonable and credible arguments in favor of the settlement, the government's choice to limit the agreement to the claims pending before the district court is not inherently unfair, inadequate, or unreasonable.

Dr. Robinson's second argument is that Indiana's recovery should not be reduced by the federal government's percentage because the federal government never reimbursed Indiana for its portion of the wrap-around claims and, now that the claims are presumed to be fraudulent, Indiana cannot seek

reimbursement. But as we indicated at oral argument, this stops the hypothetical math problem partway through its solution. If Dr. Robinson had not filed *Robinson I*, Indiana presumably would have reimbursed HealthNet for its wraparound claims and the federal government would have, in turn, reimbursed Indiana for approximately 66% of each claim. Compounding this issue, Dr. Robinson herself moved to dismiss the federal government's claims. R. 86. She cannot now seek a relator's share based on the claims that she dismissed, and the district court's conclusion that the FMAP should be applied was not an abuse of its discretion.

Aside from the arguments discussed above, Dr. Robinson does not challenge the district court's reasoning that the settlement agreement was fair, adequate, and reasonable. Nor does she challenge the district court's procedure or, aside from the arguments addressed above, the district court's decision to award her a 20% relator's share. Dr. Robinson received notice of Indiana and HealthNet's motion to approve the settlement, and the district court followed its statutory obligation to provide Dr. Robinson an opportunity to be heard. R. 84 at 6–7. Because we find that the district court did not abuse its discretion in rejecting Dr. Robinson's challenges to the fairness of the settlement agreement, and because Dr. Robinson has provided no other argument against the district court's analysis or claimed shortcomings in the district court's procedure, we find the settlement agreement to be fair, adequate, and reasonable under the circumstances.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.